## STAMETS *vs.* QUINN AND WALSH.

Bill by creditor, under attachment proceedings, to reach and apply to the payment of creditors' claims, certain money alleged to be due their debtor under contract for labor, and under an assignment by him to his co-partner of all his tools and implements, his interest in the contract, and the money due and to become due thereon, on the ground that the assignment was merely colorable, and for the purpose of protecting his interest and property against his creditors. *Held,* that the assignment was *bona fide* and absolute, and necessary to protect his co-partner, who had advanced the debtor large sums of money, and without which he would have been entirely without security.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. B. C. Frost,* for complainant.

*Mr. J. F. Dumont,* for defendant Walsh.

THE CHANCELLOR.

. The complainant's bill is filed actually, though not nominally, in behalf of himself and other creditors of Peter H. Quinn. For the recovery of his debt, he caused to be issued, out of the Supreme Court of this state, in December, 1874, an attachment against Quinn as a non-resident debtor, under which the money alleged to be due to Quinn from Clark and White, under a contract between him and them for the construction by him of a culvert over the Musconetcong creek, for the Easton and Amboy Railroad Company, was attached. The other creditors filed their claims under the attachment, and in September, 1875, judgment was entered in the suit in favor of the complainant and the applying creditors, for the amount reported by the auditor to be due to them respectively. The object of this suit is to reach and apply to the payment of their claims, certain money alleged to be due to Quinn for materials found and work done in and for the work above mentioned, prior to the 21st of January, 1874, up to which time he was engaged in the work on his own account alone, and the amount alleged to be due to him from that time for his share of the profits of the work. At that date, the defendant, Patrick Walsh, entered into co-partnership with him in the performance of so much of the work as then remained to be done. The partnership was formally dissolved by written agreement on the 12th day of March following, and, from that time, the work was continued to its completion by Walsh. After the work was completed, he entered into a verbal contract, in his own name, with Clark and White for building a buttress, and built it accordingly. The complainant alleges, and his claim to relief is based on the allegation, that although, by the agreement of dissolution, Quinn assigned to Walsh, in consideration of payment, to be made by the latter, of the then existing partnership debts of Quinn and Walsh, his interest in the contract, and all money due or to become due, whether to him alone or to them under it, and all his tools and implements at the work, yet the assignment was, in fact, colorable merely, and was designed to protect that interest and property

against the claims of his creditors; and that he still continued to be a partner with Walsh in the work. The complainant insists that the contract for building the buttress was taken and executed by Walsh on the partnership account, and that, therefore, Quinn is entitled to half of the net profits thereof. The question involved is one of fact merely, and it has been submitted to the court without argument, on the testimony and exhibits. In addition to the facts above stated, it appears that, in January, 1874, Quinn, who was then engaged in constructing the culvert, was embarrassed by his debts; that his necessities in that respect were so great as to threaten him with the loss of the contract and of the per centage, (fifteen per cent.,) which, under it, had been retained by Clark and White as security for the completion of the work, and which they were authorized to hold accordingly until the work was done. In this strait, he, through Timothy Burke, his foreman, applied to Walsh, who lived in New York and was then a stranger to Quinn, but well known to Burke, for a loan of $2000. Walsh was unable to accommodate him with that amount, but endeavored to aid him in borrowing it elsewhere. The effort proving unsuccessful, he offered to lend $1000, provided the payment thereof should be secured to his satisfaction. He, at the request of Quinn, came to see the latter at the work, and Quinn then gladly accepted the offer of the loan of $1000, and proposed to secure its payment by a mortgage of his tools and implements there, which included a steam engine and certain derricks. This proposition was not acceptable to Walsh. He did not consider the security sufficient, and he, therefore, declined to lend the money upon it. Quinn then proposed that he should enter into partnership with him in the execution of the contract, and offered to give him an equal interest with himself in it, if he would contribute $1000 in cash as capital; Quinn proposing to contribute the materials which he then had on the ground or in the vicinity, and which were of the value of that sum. He also offered to secure Walsh against loss by mortgaging the tools and implements to him, to secure the $1000, and he assured him that

there was no lien or encumbrance upon them. Walsh, with some reluctance, consented to enter into the partnership, and in doing so, relied on the assurances of Quinn that $1000 in cash would relieve him from his embarrasment, and enable him to complete the contract, and that the tools and implements were, indeed, free of lien or encumbrance. The partnership agreement was entered into between them on the 21st of January, 1874. Walsh living in New York, did not propose to attend to the work, but employed Burke as his substitute therein. Almost immediately after the partnership agreement was entered into, Quinn applied to Walsh for $400 to pay workmen, and again for the like sum to pay freights, promising to re-pay the money out of the January estimate of the work. Walsh advanced the money. Quinn received the amount of the January estimate, but did not re-pay these loans or any part of them. In the January estimate was included the sum of $1200 for stone on the ground, being the very materials which were put into the concern by Quinn, as capital. This sum of $1200 he also received and applied to his own use. Walsh, becoming indignant and alarmed by this action on the part of Quinn, upbraided him, and requested him to secure to him the money he had put in as capital and the money advanced, and to dissolve the partnership. Quinn, being unable to find security, although Walsh gave him full opportunity to do so, proposed to assign to the latter his interest in the contract, and the money due and to become due upon it, and the tools and implements before referred to, in consideration of Walsh's paying the debts of the firm. An agreement to that effect was accordingly entered into by them on the 12th of March, 1874, and Quinn left the state, and Walsh proceeded to complete the work, and did so, furnishing the capital necessary for the purpose, as, from time to time, it was required. The complainant's theory is, as before remarked, that this assignment was merely colorable, and that the arrangement was intended for no other purpose than to protect Quinn's interest and property against his creditors, and that the relations

between him and Walsh were not, in fact, changed, but that the understanding between them was that the latter was to proceed to finish the contract, superintending the work and finding the requisite capital, and divide the net profits with Quinn. However much Quinn may have been disposed to relieve himself from embarrassment from his individual creditors, and however that embarrassment may have contributed to his willingness to make the assignment, that clearly was not his sole, nor was it his principal motive. Walsh was very indignant, and justly so. He apprehended, as a result of his kind assistance of Quinn, a liability to very considerable pecuniary loss, and he was, with abundant reason, alarmed. He demanded security, and threatened to take severe proceedings, immediately, against Quinn, unless his demand was complied with. The latter then, as a dernier resort, offered to make the assignment, which was accepted. There is no evidence of a design on the part of Walsh to protect Quinn's property, or his interest in or under the contract, from his creditors. There is evidence of bad faith on the part of Quinn in his abuse of Walsh's confidence. He had spent the $1000 contributed by the latter to the capital of the firm, in paying his own debts. He had, in like manner, disposed of the $800 which he had received from Walsh to pay workmen and freight. He had received, in the January estimate, and applied to his own purpose, not only the money due for work done, out of which he had promised to re-pay the $800 just referred to, but he had also received and applied to his own purpose, $1200 for the price of the very materials which he had contributed as capital, and which constituted his entire contribution to the capital. That Walsh should have demanded a dissolution, and security for his money, was to have been expected, and that he desired to leave the business, is beyond question. Quinn endeavored to obtain security, first in this state, and then in Philadelphia, but was unsuccessful; and it was only when he found himself wholly unable to give security, that he proposed to make the assignment. The evidence is clear that Walsh, in

obtaining the assignment, was merely pursuing his own interest, irrespective of that of Quinn, and that he did not seek the assignment, but accepted it as his only means of extrication from the difficulties of his position. It is true, Quinn swears that there was an understanding between him and Walsh that he was to share in the profits, but he says, also, that the sole object and purpose of the assignment were " to protect Walsh's interest and prevent Walsh from selling out all the effects belonging to the partnership, and " him " individually, as he threatened to do." He further says, in answer to the question whether, in making the assignment, he had any purpose or object to prevent annoyance from his creditors, that his sole object was to get the work completed, and get what money belonged to him, either from the work that was to be done or that which had been previously done and was unmeasured, part of the price whereof had been retained by Clark and White under the contract, so that he could pay his creditors in full, or as much of their debts as he might thus be enabled to pay. Notwithstanding the testimony of Quinn, which is but slightly corroborated, the evidence shows, conclusively, that the assignment, instead of being an arrangement for Quinn's accommodation, was made by him for the satisfaction of Walsh's claims against him, and in consideration thereof, and of the payment of the partnership debts by Walsh. The letters of the latter to Quinn, which are relied upon as proof of fraud against the creditors of Quinn, are, especially in view of the explanations and explanatory circumstances which appear in the case, of but little weight. The circumstances of the assignment forbid the conclusion that it was designed, in any way, to defraud, defeat, hinder, or delay the creditors of Quinn. From the time of the dissolution, the 12th of March, 1874, Walsh carried on the business in his own name and on his own account, furnishing all the capital required for it, and refusing, according to the testimony, to pay or recognize any of the individual debts of Quinn, and claiming that the latter had no interest whatever in the work. From the time

of the dissolution, Quinn stayed away from the work, and gave it no attention, and apparently had no interest in it. His creditors can, under the proof, have no claim to any of the profits of the contract after that date, and there is no ground on which any claim can be made in their behalf, in respect of the building of the buttress, which was done by Walsh under an independent contract made expressly with him, and understood to be made with him alone, by Clark and White. The money due Quinn individually, on the contract, at the time of the dissolution, for per centage on work done by him alone, retained by Clark and White, was not sufficient in amount to pay his debt to Walsh. Quinn could not have got it except on the completion of the work according to the contract, and he was unable to finish it. Walsh had no means of re-imbursement, except the assignment, and to obtain the money withheld by Clark and White for security, it was necessary for him to complete the work. There are indications in the case that this suit is rather the suit of Quinn than of Stamets, the complainant. Quinn, of course, would have no standing before the court, in the case made by the bill—fraud upon his creditors in making the assignment. The complainant has failed to show the fraud on which his claim to relief is based. The bill will be dismissed, with costs.